UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


LUIS FARGAS,                                          CIVIL NO. 06-3267 (JRT/JSM)

      Plaintiff,

v.                                                   <u>REPORT AND RECOMMENDATION</u>

UNITED STATES OF AMERICA,
FEDERAL BUREAU OF PRISONS,
OFFICER VAVA, OFFICER SMITH,
and L.T. MILLER, FBOP Correctional
Official,

      Defendants.


The above matter came on before the undersigned upon defendants' Motion to Dismiss [Docket No. 12].  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1.

## I.   FACTUAL BACKGROUND

Plaintiff, Luis Fargas, alleged in his Complaint that on March 27, 2006, he was housed in a segregated housing unit ("SHU") at FMC-Rochester, when he was directed by Bureau of Prison ("BOP") staff to move into a cell shared by inmate Rives, who plaintiff claimed was a known gang member and was HIV positive.  <u>See</u> Complaint, ¶¶ V(1)-(2).  Plaintiff asserted that he notified correctional officers Vava and Smith of Rivas' status and his objection to being placed in the same cell with Rivas.  <u>Id.</u>, ¶ V(2).  These defendants disregarded his warnings and forced him into the cell with Rivas.  <u>Id.</u>, ¶ V(3).  Rivas then began yelling and telling plaintiff, Vava and Smith that he did not want anyone in his cell and would act violently if another inmate was placed in his cell.  <u>Id.</u>, ¶ V(4).  Vava and Smith instructed both inmates to approach the cell door and consent to

being handcuffed.  Id., ¶ V(5).  Once plaintiff was handcuffed, inmate Rivas physically assaulted him and was allowed to beat him for several minutes before guards intervened.  Id., ¶¶ V(5), (7).  According to plaintiff, defendant Lieutenant Miller knew or should have known of Rivas' past gang affiliations, and yet allowed the inmates to be housed together, despite being aware of the high probability of violence.  Id., ¶ V(13).  In addition, plaintiff claimed that defendants Vava and Smith knew or should have known about Rivas' assaultive nature and gang involvement, intentionally placed him into a cell with Rivas knowing that a fight would ensue, and allowed Rivas to beat him for an unusually long time before taking any action.  Id., ¶¶ V(14), (15).

Plaintiff was taken to the medical area to be treated for the injuries that resulted from inmate Rivas' attack.  Id., ¶¶ V(8), (9).  Plaintiff asserted that he was later refused medical treatment and proper pain medications by FMC-Rochester medical staff, and that as a consequence of defendants' actions, he continues to suffer extreme physical distress, emotional disabilities and psychiatric disabilities.  Id., ¶¶ V(10), (11).

According to plaintiff, he took many steps to exhaust his claims against defendants.  First, he filed a BP-8 Form which was not answered.[1]  Complaint, ¶ III(C).  On March 30, 2006, plaintiff sent a Request for Administrative Remedy form, also known as a BP-9 form, to the BOP Regional Office[2] where he set out the incident on March 27, 2006, and requested investigation of his placement into the cell and his allegation that an officer told him to shut up for complaining about being assaulted.  See Complaint, ¶ III(C), Ex. C.  Plaintiff alleged that the Region rejected the BP-9 form on

---

[1]     Neither plaintiff nor defendants provided the Court with a copy of this BP-Form.

[2]     According to plaintiff, he mailed the BP-9 form to the BOP regional office because BOP staff at FMC-Rochester would not accept or deliver it to officials.  Complaint, ¶ III(C).

April 11, 2006, because he had failed to process the complaint through FMC staff. Complaint, ¶ III(C); see also Declaration of Christopher Nickrenz, ¶¶ 6, 7 (stating that "the administrative remedy request was rejected because plaintiff never provided any information establishing that he attempted to informally resolve the issues forming the basis for his remedy requests."), Ex. A, p. 2.  On April 11, 2006, plaintiff sent a letter to Lieutenant Miller telling him to order his staff to give him a BP-8 or BP-9 form, so that he could file his grievances against officers Vava and Smith arising out of the March 27, 2006 incident.  See Complaint, Ex. B.  Plaintiff complained that he had asked for these forms, but that no one would bring him the forms.  Id.  On April 13, 2006, plaintiff sent a letter to Warden Marty Anderson stating that he was in lockup and could not get to a counselor to get a BP-8 or BP-9 form and he had no success getting one from a guard. Id., Ex. A.  Plaintiff stated that without these forms he could not commence the administrative process.  Id.  He also represented that he was going to get a BP-9 form from another inmate and mail it straight to the region.  Id.  Plaintiff alleged that he then wrote to the Region explaining the situation, which forwarded his letter to Warden Anderson.  Complaint, ¶ III (C).[3]

On April 28, 2006, Warden Anderson responded to plaintiff's letter to the Regional Director, stating it had been forwarded to his office for a response to plaintiff's request to have the March 27, 2006 incident investigated.  Id., Ex. E.  According to Warden Anderson, plaintiff had been moved to another cell because he had been charged with fighting with another inmate and that when he was moved to the new cell he began a verbal altercation with his cellmate.  Id.  After plaintiff was handcuffed, a fight ensued, staff responded, plaintiff was treated for injuries suffered during the fight

---

[3]      No copy of this letter was attached to the submissions of plaintiff or defendants.

and he was placed in a different cell.  Id.  According to Warden Anderson, plaintiff's incident report had been expunged and he had concluded that the staff appeared to have behaved in an appropriate and professional manner.  Id.  Plaintiff did not appeal this response.

On May 1, 2006, plaintiff submitted a second BP-9 form, which was received by the BOP on May 3, 2006, requesting that the events of March 27, 2006 be investigated.  See Nickrenz Decl.,  ¶¶ 6, 7, Ex. A, pp. 1, 4.  On May 3, 2006, plaintiff received a rejection notice for an administrative remedy.  See Complaint, Ex. D; Nickrenz Decl.,  ¶¶ 6, 7, Ex. A, p. 4.  The request was rejected because plaintiff did not submit his request through his counselor or other authorized person, and because plaintiff wrote in Part B of the BP-9 form, which is reserved for a response by the BOP.  Id.

On May 8, 2006, plaintiff sent a letter to Region Counsel Daryl Kusiak complaining that his BP-9 form had been rejected on May 3, 2006 because he did not submit it through the right prison staff.  See Complaint, Ex. F.  Plaintiff stated that he could not submit the form to the right prison staff because he could not obtain one through his unit team.  Id.  Plaintiff also stated that he wrote to the Warden about this, however, the problem still continued and plaintiff did not know if the Warden had received his complaints.  Id.  Plaintiff asked the Regional Office to accept the letter as another BP-9 request and to send him a BP-10 form if they denied his BP-9 letter.  Id.  No evidence was presented that the Regional Office responded to this letter to Region Counsel Kusiak.[4]

Separate from plaintiffs' efforts to grieve the March 27, 2006 incident, plaintiff also submitted a Standard Form 95 prescribed by the Department of Justice for a claim

---

[4]     Defendants' submission does not address this letter to Regional Counsel Kusiak at all.  Thus, they did not give any indication that they had received or responded to it.

of damage.  See Declaration of Dennis Bitz ("Bitz Decl."), Ex. D.  The basis of the claim, in relevant part, was as follows:

> Officer Smith approached my cell stating I was moving and to pack my belongings.  I asked Officer Smith where I was moving to.  He stated with the Mexican inmate and pointed to the cell.  I told the officer Smith that I had problems with this inmate and to please not move me in there.  Officer Smith asked if I was scared.  I told him - Officer Smith I don't want any problems then proceeded to cuff up so I may move to follow the directive the officer gave me.  At this point they placed me in the new cell with this inmate. Officer removed both our handcuffs and the inmate in front of Officer Smith in Spanish called me a snitch and a bitch and other derogatory names.  Officer Smith then decided to move me.  He stated for me to cuff up.  I cuffed up at that point the other inmate who was not cuffed up began to strike me in the face, pushing face and head in wall causing me to fall then kicking me.  This caused personal injury to me.

Id.  Plaintiff sought $200,000 in monetary damages.  Id.

On May 31, 2006, the Department of Justice responded to plaintiff's federal tort claim.  See Complaint, Ex. H.  The Government stated that the investigation of plaintiff's claim did not reveal that he had suffered any personal injuries as result of the negligent acts or omissions of BOP employees acting within the scope of their employment.  Id. The Government denied plaintiff's claim, provided him with a notification of a final denial and notified him that he had six months to file a suit in federal court.  Id.

In his Complaint, plaintiff alleged that Vava and Smith conspired with others to "cover-up" the incident on March 27, 2006, and prevented him from bringing legal action in the courts.  Complaint, ¶ V(17).  Plaintiff claimed that Viva and Smith, along with unknown BOP staff, knowingly and intentionally obstructed and impeded his ability to access the BOP administrative remedy process and the courts.  Id., ¶ V(20).  Plaintiff alleged that he sent letters to Lieutenant Miller, through third-party mail, but that Miller failed to correct the cover-up or ensure that plaintiff was placed in a secure area.  Id., ¶

V(18).  Plaintiff complained that Lieutenant Miller intentionally obstructed and impeded his efforts to get help and access to the courts.  Id., ¶ V(19).  Plaintiff asserted a Bivens[5] claim based on the Fifth and Eighth Amendments as to all defendants, and a tort claim against the United States and the BOP.[6]  See Complaint, ¶¶(23), VI.

On May 28, 2007, defendants filed a Motion to Dismiss.  As to plaintiff's tort claims, defendants argued that they must be dismissed on the grounds that plaintiff failed to exhaust his administrative remedies as to any medical malpractice claim and that the discretionary function exception under the FTCA precluded any claim of negligence arising out a correctional officer's decision to place him in a cell with another inmate and wait for backup prior to breaking up the fight.  With respect to plaintiff's constitutional claims, defendants contended they must be dismissed because plaintiff failed to exhaust his administrative remedies, and on grounds that they failed to state a claim as a matter of law or are precluded by qualified immunity.

On July 18, 2007, this Court issued an Order [Docket No. 24] requiring plaintiff to file a response to defendants' Motion to Dismiss on or before August 13, 2007.  In a July 27, 2007 letter [Docket No. 25], plaintiff asserted that he had a good case and reiterated the events that took place during the March 27, 2006 assault.  In particular, plaintiff asserted that he was placed into a cell with Rivas, a verbal confrontation

---

[5]   Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

[6]   Plaintiff also has sent numerous letters to this Court asserting a myriad of complaints regarding his incarceration in the United States Penitentiary in Atlanta, Georgia and at FCI-Coleman in Florida, including: being placed into segregation; not receiving mail; a lack of hot water or food; losing his clothing; staff reading his legal mail; staff interfering with his administrative rights; no law library; and a lack of medical care.  See Docket Nos. 25, 26, 27, 28 31.  To the extent that plaintiff was asking this Court to provide him with relief arising out of activities that took place in Atlanta, Georgia, or in Florida, this Court, in the District of Minnesota, lacks the requisite jurisdiction to hear plaintiffs' claims and grant him relief.

occurred, Officer Vava ordered inmates to submit to handcuffs, plaintiff complied, and then Rivas began hitting plaintiff.   Id.   Officer Smith called for staff assistance and activated his body alarm, while Rivas continued to assault plaintiff.   Id.   Plaintiff presented no response to defendants' claim that he failed to exhaust his administrative remedies with respect to his constitutional claims.

## II.   ANALYSIS

### A.   Plaintiff's Federal Tort Claim Act Claim

Plaintiff has asserted "Tort Claim damages from the USA and the BOP in the amount of $500,000.00."   See Complaint, ¶ VI(6).   Defendants maintain that plaintiff's FTCA claims must be dismissed for a lack of subject matter jurisdiction on the grounds that: (1) plaintiff failed to exhaust his administrative remedies as to any medical malpractice claim under the FCTA; and (2) that the discretionary function exception under the FTCA precludes any claim of negligence arising out a correctional officer's decision to place him in a cell with another inmate and waiting for backup prior to breaking up the fight.

### 1.   Standard of Review

"[I]f a plaintiff lacks standing, [a] district court has no subject matter jurisdiction. Therefore, a standing argument implicates Rule 12(b)(1)."   See Faibisch v. Univ. of Minnesota, 304 F.3d 797, 801 (8th Cir. 2002).   A motion to dismiss for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), may challenge the plaintiff's complaint either on its face or on the factual truthfulness of its averments.   See Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993); see also Osborn v. United States., 918 F.2d 724, 729 n. 6 (8th Cir. 1990).   In a facial challenge to jurisdiction, the court restricts its review to the pleadings and affords the non-moving party the same protections that it

would receive under a Rule 12(b)(6) motion to dismiss.  See Osborn, 918 F.2d at 729 n. 6.  The court presumes that all of the factual allegations in the complaint concerning jurisdiction are true and will not dismiss the claims unless the plaintiff fails to allege an essential element for subject matter jurisdiction.  See Titus, 4 F.3d at 593 (citing Eaton v. Dorchester Dev., Inc., 692 F.2d 727, 731-32 (11th Cir. 1982)); Osborn, 918 F.2d at 729 n 6.

In a factual challenge to jurisdiction, the court may consider matters outside the pleadings and the non-moving party does not benefit from the safeguards of 12(b)(6).  See Titus, 4 F.3d 590 at 593; Osborn, 918 F.2d at 729 n. 6.  "In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.  Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist."  Osborn, 918 F.2d at 730 (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F. 2d 884, 891 (3rd Cir. 1977)).

Here, depending on the claim, the Government has brought both facial and factual challenges to jurisdiction, and the Court will consider the specific claims accordingly.

## 2.   Exhaustion of Remedies

Defendants argued that plaintiff failed to exhaust his administrative remedies relating to any medical malpractice claim under the FCTA asserted in his Complaint.[7]  With regards to procedural requirement of the Act, "[t]he FTCA is a limited waiver of sovereign immunity which requires compliance with the conditions enacted by

---

[7]     Dismissal of a FTCA claim for failure to meet the administrative exhaustion requirement is proper due to a lack of subject matter jurisdiction.  See Lunsford v. United States, 570 F.2d 221, 224 (8th Cir. 1977).
.

Congress." Bellecourt v. United States, 994 F.2d 427, 430 (8th Cir. 1993). "These conditions are construed narrowly . . . ," and include the restriction that a person may not bring an action in federal court for money damages under the FTCA until a "sum certain" claim has been presented to the appropriate federal agency in writing, and the agency has denied the claim. Id. (citing 28 U.S.C. § 2675(a)). "Presentment of an administrative claim is jurisdictional and must be pleaded and proven by the FTCA claimant." Id. (citations omitted). Thus, before a party can pursue a claim against the United States, that person must exhaust his or her administrative remedies.

Regulations promulgated pursuant to the FTCA provide that a claim is presented "when a Federal agency receives from a claimant . . . an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death." 28 C.F.R. § 14.2(a); see also Ahmed v. United States, 30 F.3d 514, 516-17 (4th Cir. 1994) (quoting Adkins v. United States, 896 F.2d 1324, 1326 (11th Cir. 1990)) (finding that "[t]his provision has been interpreted by the courts to indicate that the claimant meets his burden if the notice (1) is sufficient to enable the agency to investigate and (2) places a 'sum certain' value on her claim.'").

Here, plaintiff submitted a Standard Form 95 prescribed by the Department of Justice for a claim of damages. See Bitz Decl., Ex. D. The basis of the claim pertained to Officer Smith's actions, or lack thereof, that contributed to another inmate attacking plaintiff. No mention was made in this claim that the FMC-Rochester medical staff had refused him medical treatment and proper pain medications, as alleged in his Complaint. Id.; see also Complaint, ¶¶ V(10), (11).

Consequently, this Court finds that while plaintiff exhausted his FTCA administrative remedies relating to his failure to protect the claim that arose from Smith's actions (see Complaint, Ex. H), he did not exhaust his FTCA administrative remedies with respect to any medical negligence claim asserted in his Complaint. "Although an administrative claim need not propound every possible theory of liability in order to satisfy section 2675(a), a plaintiff cannot 'present one claim to the agency and then maintain suit on the basis of a different set of facts.'" Deloria v. Veterans Admin., 927 F.2d 1009, 1011-12 (7th Cir. 1991) (quoting Dundon v. United States, 559 F. Supp. 469, 476 (E.D.N.Y. 1983)).   In Deloria, the court held that while the plaintiff made an administrative claim that Veteran's Administration ("VA") employees conspired to alter his medical records, it was not sufficient to apprise the VA of the malpractice and negligence charges he leveled in his complaint, as these allegations involve wholly distinct incidents and would therefore not provide the VA with notice of the plaintiff's additional claims of medical malpractice and negligent supervision.  Id. at 1012.  In this case, this Court finds that plaintiff's negligence claim arising out Officer Smith's failure to protect him from another inmate would not have provided the BOP with notice of his additional claims of medical malpractice.  As such, this Court finds that defendants' Motion to Dismiss plaintiff's medical malpractice claim under the FTCA should be granted and the claim dismissed without prejudice for a failure to exhaust administrative remedies.  See Magnuson v. United States, No. 87-3308-O, 1994 WL 478308 at *4 (D. Kan. Aug. 31, 1994) ("While the court recognizes that an administrative claim need not present every possible theory of liability to satisfy the exhaustion requirement, plaintiff's claims concerning negligence resulting in insufficient protection and injury are distinct from the medical claims and did not provide the Bureau of Prisons with notice of his

claims of inadequate medical care."); see also 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues. . . .").

### 3.    Discretionary Function Exception

Defendants also argued that the discretionary function exception under the FTCA precludes any claim by plaintiff for negligence arising out the correctional officers' decision to place him in a cell with another inmate or waiting for backup in order to break up the fight between plaintiff and Rivas.[8]

The FTCA "is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment.'" Audio Odyssey, Ltd. v. United States, 255 F.3d 512, 516 (8th Cir. 2001) (quoting United States v. Orleans, 425 U.S. 807, 813 (1976)).  "Under the FTCA, the United States is liable, as a private person, for 'injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting under the scope of his office or employment.'" Western Nat. Mut. Ins. Co. v. United States, 964 F. Supp. 295, 297 (D. Minn. 1997) (quoting 28 U.S.C. § 1346(b)).  However, the FTCA does not waive immunity for "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

---

[8]      If an alleged act falls within FTCA's discretionary-function exception, there is no waiver of sovereign immunity and the court lacks subject matter jurisdiction.  See Dykstra v. U.S. Bureau of Prisons, 140 F.3d 791, 795 (8th Cir. 1998) (citation omitted).

In order for a claim to fall within the discretionary function exception of the FTCA, it must comply with two requirements: (1) the challenged governmental action must involve a "judgment or choice", and (2) the governmental decision must implicate an exercise of judgment based on considerations of public policy. See Dykstra, 140 F.3d at 795 (citing United States v. Gaubert, 499 U.S. 315, 322 (1991); Berkovitz v. United States, 486 U.S. 531, 536-37 (1988)). With regards to the first requirement, "if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," and "the employee has no rightful option but to adhere to the directive," the conduct does not involve an element of choice and therefore is not discretionary. See Gaubert, 499 U.S. at 322 (internal marks omitted). "When no mandate exists, however, the governmental action is considered the product of judgment or choice (i.e., discretionary), and the first step is satisfied." Dykstra, 140 F.3d at 795.

In this case, the challenged BOP action is that BOP employees knew or should have known about Rivas' assaultive nature and gang involvement, which according to plaintiff, should have prevented him from being placed into the cell with Rivas in the first place, and that BOP employees took an unusually long time before they stopped the fight between him and Rivas.

The BOP has a general duty of care to safeguard prisoners pursuant to 18 U.S.C. § 4042, which provides in relevant:

> The Bureau of Prisons, under the direction of the Attorney General, shall—
>
> * * *
>
> [P]rovide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise; [and] provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States.

18 U.S.C. § 4042(a)(2)-(3).

However, the general duty set forth by § 4042(a) does not mean that the BOP cannot exercise judgment on how to fulfill that duty.  See Santa-Rosa v. United States, 335 F.3d 39, 44 (1st Cir. 2003) (finding that § 4042 does not mandate any course of action, but instead gives the BOP ample room for judgment) (citation omitted); Cohen v. United States, 151 F.3d 1338, 1342 (11th Cir. 1998) ("even if § 4042 imposes on the BOP a general duty of care to safeguard prisoners, the BOP retains sufficient discretion in the means it may use to fulfill that duty to trigger the discretionary function exception"); Calderon v. United States, 123 F.3d 947, 950 (7th Cir. 1997) ("While it is true that this statute sets forth a mandatory duty of care, it does not, however, direct the manner by which the BOP must fulfill this duty. The statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates.").

On March 27, 2006, plaintiff and inmate Rivas were subject to administrative detention in the FMC-Rochester SHU.  See Complaint, ¶¶ V(1)-(2).  Under the applicable regulation, 28 C.F.R. § 552.22, "[a]dministrative detention is the status of confinement of an inmate in a special housing unit in a cell either by self or with other inmates which serves to remove the inmate from the general population."  (emphasis added).  While both plaintiff and Rivas had central inmate monitoring system ("CIMS") classifications pursuant to 28 C.F.R. § 524.70-76, requiring them to be separated from particular inmates, their classifications did not require them to be separated from each other. See Declaration of Don Vava, ¶ 6; Declaration of Steve Smith, ¶ 6; Declaration of Todd Miller, ¶ 8.  Thus, none of the applicable regulations provided a mandatory requirement that SHU inmates such as plaintiff and Rivas could not be placed in the

13

same cell together based on their classifications.  As such, the decision by BOP employees to place plaintiff and Rivas together in a cell was discretionary.

As for the BOP employees' failure to immediately break up the fight between plaintiff and Rivas, the regulations provide:

> Immediate use of force. Staff <u>may</u> immediately use force and/or apply restraints when the behavior described in § 552.2, [such as the assault of one inmate by another] constitutes an immediate, serious threat to the inmate, staff, others, property, or to institution security and good order.

28 C.F.R. § 552.21(a) (emphasis added).  The "use of the term 'may' in the regulations imports discretion." <u>Dykstra</u>, 140 F.3d at 796.  As such, the officers had the discretion to use or not to use immediate force to stop the assault.  Further, Officers Smith and Vava have stated that they complied with BOP security requirements by waiting for additional staff to respond to the emergency situation in SHU, so as to contain the situation without exposing staff to the risk of being injured or being held as hostages.[9] <u>See</u> Vava Decl., ¶¶ 17-19; Smith Decl., ¶¶ 17-19.  The officers' actions were not compelled by statute or regulation, "as there exists no provision that mandates breaking up inmate fights immediately, possibly at the expense of safety of the prison personnel. . . ." <u>Taveras v. Hasty</u>, No. Civ.A.CV-02-1307(DGT), 2005 WL 1594330 at *4 (E.D.N.Y. July 07, 2005).   Therefore, this Court concludes that the officers' decision not to immediately break up the assault was discretionary in nature.

As stated previously, the second requirement for the applicability of the discretionary function exception is that the discretionary conduct must implicate an exercise of judgment based on considerations of public policy.  <u>See</u> <u>Dykstra</u>, 140 F.3d

---

[9]    This Court notes that plaintiff, in his a July 27, 2007 letter to the Court [Docket No. 25], affirmed the officers' representations by admitting that Officer Smith called for staff assistance and activated his body alarm before officers stopped the assault.

at 795.  The Supreme Court has concluded that "prison administrators . . . should be accorded wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  Bell v. Wolfish, 441 U.S. 520, 527 (1979).  "Such second-guessing of the BOP's discretionary decisions is the type of thing avoided by the discretionary function exception, which is designed to 'prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'"  Cohen, 151 F.3d at 1344 (quoting Gaubert, 499 U.S. at 323) (internal citations and quotations omitted).  The BOP officers' decision on how to house an inmate and the on-the-spot decision of whether to immediately break up a fight or wait for assistance, addressed the balancing of the rights of plaintiff with the overall security of the facility, thereby involving the application of public policy principles contemplated by the discretionary-function exception.

For all these reasons, this Court finds that plaintiff's FCTA claims pertaining to his placement in the cell with inmate Rivas and the response by officers to his assault, are barred by the discretionary-function exception, and this claim should be dismissed with prejudice.[10]  See Muick v. Reno, No. 03-1725, 2003 WL 22952703 at *1 (8th Cir. Dec. 10, 2003) (per curium) ("Muick's FTCA claim arising from the attack is barred by FTCA's discretionary-function exception, because Muick based the claim on staffing, classification and placement of inmates, and responses to inmate fights.") (citations omitted).

---

[10]    This also applies to plaintiff's FTCA claim to the extent he asserted any intentional torts.  See Medina v. United States, 259 F.3d 220, 225 (4th Cir. 2001) (citing Jackson v. United States, 77 F. Supp.2d 709, 714 (D. Md. 1999)) ("The Court holds that a FTCA plaintiff must first overcome the discretionary function 'hurdle' before the Court will consider intentional tort claims under § 2680(h).").

**B.**     **Exhaustion of Claims Under the PLRA**

The Government asserts that plaintiff's <u>Bivens</u> claims for violation of his Fifth and Eighth Amendment Rights should be dismissed as a matter of law, as plaintiff failed to fully exhaust his administrative remedies. <u>See</u> Defs.' Mem. at p. 8.

1.     <u>Standard of Review</u>

When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), courts must view the complaint in the light most favorable to the non-moving party and may dismiss the complaint only if no relief can be granted under any set of facts that could be proven consistently with the complaint's allegations. <u>Alexander v. Peffer</u>, 993 F.2d 1348, 1349 (8th Cir. 1993) (quoting <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984)). Here, however, the Government relied on the declarations of BOP employees with regards its Motion to Dismiss that introduced matters outside of the Complaint. Therefore, this Court converts defendants' motion to dismiss with regard to exhaustion of administrative remedies into a motion for summary judgment. <u>See</u> Fed. R. Civ. P. 12(b)(6) ("If, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. . . .").

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celeotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986); <u>see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co.</u>, 980 F.2d 1217, 1219 (8th Cir. 1999). "[S]ummary judgment procedure is properly regarded not

as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327. "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995). "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial." Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted). The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

2.   Analysis

Section 1997e(a), which was enacted in 1996 as part of the Prison Litigation Reform Act of 1995, ("the PLRA"), provides that:

> No action shall be brought with respect to prison conditions
> under section 1983 of this title, or any other Federal law, by

> a prisoner confined in any jail, prison, or other correctional
> facility until such administrative remedies as are available
> are exhausted.

This statute requires that prisoners must exhaust all of their available administrative remedies before they can bring a civil rights action based on the conditions of their imprisonment. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." Porter v. Nussle, 534 U.S. 516, 524, 532 (2002) ("Thus federal prisoners suing under Bivens [ ], must first exhaust inmate grievance procedures just as state prisoners must exhaust administrative processes prior to instituting a § 1983 suit."). A prisoner must exhaust his administrative remedies before bringing a federal civil rights action, regardless of the nature of his claim or the relief he is seeking. See Booth v. Churner, 532 U.S. 731, 741 (2001). Exhaustion under the PLRA requires "proper exhaustion," which "demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings. Woodford v. Ngo, --- U.S. ---, 126 S.Ct. 2378, 2386-87 (2006) (emphasis added). In other words, "proper exhaustion" of administrative remedies, "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Id. at 2385 (quotation and marks omitted).

As to the purpose of this requirement, the Eighth Circuit Court of Appeals has explained:

> Beyond doubt, Congress enacted § 1997e(a) to reduce the
> quantity and improve the quality of prisoner suits; to this
> purpose, Congress afforded corrections officials time and
> opportunity to address complaints internally before allowing
> the initiation of a federal case. In some instances, corrective
> action taken in response to an inmate's grievance might

> improve prison administration and satisfy the inmate, thereby
> obviating the need for litigation.  In other instances, the
> internal review might filter out some frivolous claims.  And for
> cases ultimately brought to court, adjudication could be
> facilitated by an administrative record that clarifies the
> contours of the controversy.

Johnson v. Jones, 340 F.3d 624, 626-27 (8th Cir. 2003); see also Woodford, 126 S.Ct.

at 2385 ("Exhaustion gives an agency 'an opportunity to correct its own mistakes with

respect to the programs it administers before it is haled into federal court," and it

discourages "disregard of [the agency's] procedures.'") (quoting McCarthy v. Madigan,

503 U.S. 140, 145 (1992));  Alexander v Hawk, 159 F.3d 1321, 1324 (11th Cir. 1998)

(quoting 141 Cong. Rec. H1472-06, *H1480 (daily ed. Feb. 9, 1995)) ("Congress

intended section 1997e(a) to 'curtail the ability of prisoners to bring frivolous and

malicious lawsuits by forcing prisoners to exhaust all administrative remedies before

bringing suit in Federal court.'"); see generally, Robley v. Anderson, No. Civ. 02-4199

(JRT/RLE), 2004 WL 742089, at *2 (D. Minn. Mar. 4, 2004) (quoting Thomas v.

Woolum, 337 F.3d 720, 725 (6th Cir. 2003) ("The exhaustion requirement ensures that

state prison systems will have an opportunity to handle prison grievances internally

before recourse to the federal courts becomes available.")).  However, under the PLRA,

failure to exhaust the available administrative remedies is an affirmative defense, with

the burden of proof falling on defendant, and not a matter of subject matter jurisdiction.

Lenz v. Wade, 490 F.3d 991, 993 n. 2 (8th Cir. 2007) (citing Jones v. Bock, --- U.S. ----,

127 S.Ct. 910, 919-922, 166 L.Ed.2d 798 (2007); see also Nixon v. Sanders, No. 06-

1013, 2007 WL 2349344 at *1 (8th Cir. Aug. 17, 2007).

        The BOP provides a comprehensive administrative remedy procedure for federal

inmates seeking to address grievances relating to their confinement.   Under the

Administrative Remedy Program, the inmate must first present his concern informally to

an appropriate staff member, who must attempt to resolve the concern.  <u>See</u> 28 C.F.R. § 542.13(a).   If the issue cannot be resolved informally, within "20 calendar days following the date on which the basis for the Request occurred," the inmate must file an Administrative Remedy Request by submitting a BP-9 form to the staff member designated by the BOP, generally the warden.  <u>See</u> 28 C.F.R. §§ 542.14(a), (c)(4).  If dissatisfied with the warden's response, the inmate may appeal to the Regional Director by filing a BP-10 form within 20 days of the date the warden signs the response.  <u>See</u> 28 C.F.R. §542.15(a).   If dissatisfied with the Regional Director's response, the inmate must file an appeal with the Office of General Counsel by submitting a BP-11 form within 30 days of the Regional Director's response.  <u>Id.</u>

In this case, plaintiff began his efforts to comply with the administrative remedy process by submitting on March 30, 2006 a BP-9 form, where he described the incident on March 27, 2006 and asked that it, along with his being place in a cell with Rivas, be investigated.  <u>See</u> Complaint, ¶ III(C), Ex. C.  There is no indication in the record or any assertion by plaintiff that he attempted informal resolution prior to sending the initial BP-9 form.[11]  The BOP rejected the BP-9 form on April 11, 2006, because he had failed to process the complaint through FMC staff.  Complaint, ¶ III(C); Nickrenz Decl., ¶¶ 6, 7, Ex. A, p. 2.  The same day, April 11, 2006, plaintiff sent a letter to Lieutenant Miller

---

[11]   While plaintiff stated in his Complaint that he filed a BP-8 form, (Complaint, ¶ III(C), he did not attach such of form to his Complaint, nor did defendants in their Motion to Dismiss.   Plaintiff also stated that the BOP-8 form is the first part of the BOP administrative process, however, neither defendants nor the regulations governing the process refer to such a form.  But the Court notes that cases do indicate that a BP-8 form is used by an inmate to make an "Attempt at Informal Resolution".  <u>See</u> <u>e.g.</u>, <u>Nixon</u>, 2007 WL 2349344 at *1; <u>Winkelman v. John Doe #1</u>, 07-CV-98-GFVT, 2007 WL 4139713 at *4 (E.D. Ky. Nov. 19, 2007); <u>Alden v. Smith</u>, NO. CIV 3CV-05-1735, 2007 WL 776868 at *5 (M.D. Pa. March 12, 2007).  In any event, both plaintiff and defendants agree that plaintiff did not engage in informal resolution prior to submitting the BP-9 form on March 30, 2006.

requesting that he order his staff to give him BP-8 and BP-9 forms, so that he could file his grievances against officers Vava and Smith arising out of the March 27, 2006 incident.  Id., Ex. B.  Plaintiff complained that he had requested these forms, but that no one would bring them to him.  Id.  On April 13, 2006, defendant sent a letter to Warden Marty Anderson, stating that he was in lockup and could not get to a counselor to get a BP-8 or BP-9 form, and had no success in getting one from a guard.  Id., Ex. A.  He stated that without these forms he could not commence the administrative process.  Id.  He also represented that he was going to get a BP-9 form from another inmate and mail it straight to the region.  Id.  Plaintiff then wrote to the Region explaining the situation, which forwarded his letter to Warden Anderson.  See Complaint, ¶ III(C).  On April 28, 2006, Warden Anderson answered plaintiff's letter  Id., Ex. E.  According to Warden Anderson, the staff appeared  to have behaved in an appropriate and professional manner during the March 27, 2006 incident.  Id.  Plaintiff did not appeal the Warden's decision to the Regional Director as required by the grievance process.  Instead, on May 1, 2006, he submitted a second BP-9 form, which was received by the BOP on May 3, 2006, again asking that his assault and the officers' actions be investigated. Nickrenz Decl., ¶¶ 6, 7, Ex. A, pp. 1, 4. On the same day, plaintiff received a rejection notice for an administrative remedy.  See Complaint, Ex. D; Nickrenz Decl., ¶¶ 6, 7, Ex. A, p. 4.  The request was rejected because plaintiff did not submit his request through his counselor or other authorized person and because plaintiff wrote in Part B of the BP-9 form, which was reserved for a response by the BOP.  Id.

On May 8, 2006, plaintiff sent a letter to Region Counsel Daryl Kusiak complaining that his office rejected his BP-9 form on May 3, 2006 because he did not submit it through the right prison staff.  Complaint, Ex. F.  Plaintiff stated that he could

not submit the form to the right prison staff because he could not obtain one through his unit team.  Id.  Plaintiff also stated that he wrote to the Warden about this, however, the problem still continued and plaintiff did not know if the Warden had received his complaints.  Id.  Plaintiff asked the Regional Office to accept the letter as another BP-9 request and to send him a BP-10 form if they denied his BP-9 letter.  Id.  No evidence was presented by plaintiff or defendants that the Regional Office responded to this letter to Region Counsel Kusiak.

This Court concludes that plaintiff failed to exhaust his administrative remedies. First, there is no indication that he attempted to informally resolve the dispute.  While plaintiff stated that he filed a BP-8 form and that it was not answered, neither he nor the defendants provided a copy of the form to the Court to support such a claim.  To the contrary, his letter to Lieutenant Miller on April 11, 2006, and to Warden Anderson on April 13, 2006, asking that he be provided with a BP-8 or BP-9 form, suggests that he never did file a BP-8 form in the first place.

Second, even if plaintiff did attempt informal resolution as he claims, once his letter to the Region complaining of the situation was answered by Warden Anderson on April 28, 2006, plaintiff did not appeal Warden Anderson's decision to the Region, much less to the Office of the General Counsel, as he was required to do by the grievance process.  Instead, he started the process all over again on May 1, 2006, by submitting a BP-9 form, which was rejected for failing again to engage in the informal resolution process.  While it is true that he timely appealed that decision to the Region, and there is no evidence to suggest that the Region answered his appeal, this second effort to grieve his claim fails because it was more than 20 days after the incident, which was the subject of his complaints.  See Woodford, 126 S.Ct. at 2388 ("For example, a prisoner

wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time. If the prison then rejects the grievance as untimely, the prisoner could proceed directly to federal court. . . . We are confident that the PLRA did not create such a toothless scheme."); see also Johnson v. Meadows, 418 F.3d 1152, 1159 (11th Cir. 2005) ("Allowing Johnson's untimely grievance to meet the exhaustion requirement would run counter to the understanding that § 1997e(a) requires prisoners to invoke and fully exhaust all available administrative grievance processes.").

For all of these reasons, this Court finds that plaintiff has not exhausted all available administrative remedies as to any of his constitutional claims, and his Bivens action must be dismissed with prejudice.  See Johnson, 418 F.3d at 1156 (noting the "policies favoring exhaustion," held that the PLRA contains a procedural default component where an inmate fails to avail himself in a timely fashion of the institution's administrative process); Wardrick v. Marberry, NO. CIV.A. 06-216-ERIE, 2007 WL 4180693 at *6 (W.D. Pa. Nov. 20, 2007) ("Plaintiff has failed to exhaust his administrative remedies. In addition, Plaintiff is foreclosed from re-submitting his appeal to the General Counsel's Office because he failed to do so within the required time period. As a result, Plaintiff has procedurally defaulted on his claim and this case should be dismissed.").

## III.    RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that:

1.      Defendants' Motion to Dismiss be **GRANTED;**

2.     Plaintiff's Complaint be **DISMISSED WITHOUT PREJUDICE** as to his medical negligence FCTA claim; and

3.     Plaintiff's Complaint be **DISMISSED WITH PREJUDICE** with respect to plaintiff's Bivens claims and the FCTA claim pertaining to his placement in the cell with inmate Rivas and the response by officers to his assault.


Dated:        January 23, 2008


                              s/ *Janie S. Mayeron*
                              JANIE S. MAYERON
                              United States Magistrate Judge


Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 11, 2008**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.